IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 124,587

In the Matter of MICHAEL P. JAHN,
*Respondent*.

ORIGINAL PROCEEDING IN DISCIPLINE

Original proceeding in discipline. Opinion filed May 20, 2022. Six-month suspension.

*Kathleen J. Selzler Lippert*, Deputy Disciplinary Administrator, argued the cause, and *Julia A. Hart*, Deputy Disciplinary Administrator, and *Stanton A. Hazlett*, Disciplinary Administrator, were with her on the formal complaint for the petitioner.

*Arthur A. Chaykin,* of Kennyhertz Perry LCC, of Mission Woods, argued the cause.

PER CURIAM:  This is an original proceeding in discipline filed by the office of the Disciplinary Administrator against the respondent, Michael P. Jahn, of Overland Park, an attorney admitted to the practice of law in Kansas in 1997.

On July 7, 2021, the office of the Disciplinary Administrator filed a formal complaint against Jahn alleging violations of the Kansas Rules of Professional Conduct (KRPC). The complaint was later amended, and Jahn filed a timely answer to the amended complaint. On September 24, 2021, Jahn and the Disciplinary Administrator entered into a summary submission agreement under Supreme Court Rule 223 (2021 Kan. S. Ct. R. at 273). Under the agreement the parties stipulate and agree that Jahn violated the following Kansas Rules of Professional Conduct:

- KRPC 1.2(a) and (e) (2022 Kan. S. Ct. R. at 329) (scope of representation);
- KRPC 1.7(a)(2) (2022 Kan. S. Ct. R. at 342) (conflict of interest:  current clients);

1

- KRPC 4.1(a) (2022 Kan. S. Ct. R. at 403) (truthfulness in statements to others);
- KRPC 4.2 (2022 Kan. S. Ct. R. at 404) (communication with person represented by counsel);
- KRPC 8.4(a), (c), and (d) (2022 Kan. S. Ct. R. at 434) (misconduct); and
- KRPC 8.5 (2022 Kan. S. Ct. R. at 435) (jurisdiction).

FACTUAL AND PROCEDURAL BACKGROUND

The relevant portions of the parties' summary submission are quoted below.

"1. <u>Findings of Fact</u>: Petitioner and Respondent stipulate and agree that Respondent engaged in the misconduct alleged as follows:

"a. Respondent, Michael P. Jahn is an attorney at law, Kansas Attorney Registration No. 17605. He was admitted to the Kansas Bar on April 25, 1997.

"b. Respondent did not hold an active Kansas license from October 13, 2005, through March 19, 2020; approximately 14 years. Respondent was administratively suspended during this period. He was not licensed to practice law in any jurisdiction during the time his Kansas license was suspended from October 2005—March 2020. Respondent's active license was reinstated on March 20, 2020.

"c. Respondent submitted his most recent attorney registration on June 20, 2021.

"d. In November 2017, Respondent entered into a diversion agreement for violations of KRPC 5.5(a) and (b)(2) for unlicensed practice of law. This diversion was based on Respondent working for the Omaha, Nebraska Office of Social Security Administration as an attorney advisor/ decision writer after his Kansas license to practice law was

2

administratively suspended and not being licensed to practice in any jurisdiction. Respondent asserted that he did not need a license to practice law because he was more of a 'scribe' than an attorney decision writer for the Social Security Administration. Respondent successfully completed this diversion, and it was dismissed in January 2019.

"e.  On July 29, 2020, Patrick M. Flood (opposing counsel) filed a complaint with the Kansas Disciplinary Administrator's Office. He provided supplemental complaint information on August 11, 2020. This complaint was assigned investigation number DA 13,548. Mr. Flood represented Skutt Catholic High School. Respondent represented S.D. who was employed as a teacher for Skutt Catholic High School.

"f.  In February 2020, Respondent and S.D. were living at the same residence in Omaha, Nebraska, and contemplating marriage. At the time, S.D. was employed as a teacher for Skutt Catholic High School in Omaha Nebraska and Respondent was working for a restaurant. Later, Respondent started working for the Small Business Administration (SBA) in July 2020.

"g.  On March 26, 2020, S.D. was notified by her employer that her teaching contract would not be renewed for the next academic school year. S.D. was distraught and believed she was a victim of discrimination.

"h.  On March 28, 2020, Respondent and S.D. signed a 'Retainer Agreement for Attorney Services.' This document stated that S.D. retained Respondent for an employment discrimination case related to her employment as a teacher for Skutt school in Omaha Nebraska. This retainer agreement stated that Respondent's work was 'pro bono' and he agreed to not charge the client; however, Respondent reserved the authority to 'seek attorney's fees.' Additionally, this document limited the scope of Respondent's representation. This was Respondent's first private law case in over two decades.

"i.  The March 28, 2020, retainer agreement stated that Respondent was licensed in the State of Kansas and the 'Federal District of Nebraska.' Respondent applied for a Nebraska Federal District Court license on April 30, 2020 and was granted a U.S. District Court of Nebraska license on May 4, 2020; approximately a month after the retainer agreement was signed. Respondent provided the retainer agreement with false information to the Office of Disciplinary Administrator as part of his response to the investigation.

"j.  On May 15, 2020, Respondent sent a demand letter to the president of Skutt school; Client S.D.'s employer. Respondent's letterhead includes his law office name, address, and email; specifically,

> The Law Offices of Michael P. Jahn
> 5907 N. 294 Circle
> Valley, Nebraska 68064
> Michael@JahnLawFirm.com

    i.  Respondent's office letterhead address on his demand letter does not coincide with any address on his Kansas Attorney Registration forms listing his home or business address.

    ii. Respondent's office letterhead address on his demand letter is identified as a single-family home. Respondent was living at Client S.D.'s home and this was not their home address.

"k.  Respondent's demand letter to Skutt school stated that he had been retained to represent S.D. and his client was willing to settle. Respondent articulated the reasons for the demand letter. Additionally, he stated that his client was willing to settle for '$122,666, an amount approximately equivalent to her 2020 salary of $62,000, benefits of $35,000, and attorney fees to date are $25,666.' Respondent concluded that he expected a response within seven days. Respondent's statement that 'attorney fees to date are $25,666' misrepresented the facts. Respondent's

4

'Retainer Agreement for Attorney Services' clearly stated that his work was pro bono.

"l.  On May 22, 2020, opposing counsel sent a reply letter to Respondent. This letter asked Respondent to refer any future correspondence regarding the matter to opposing counsel.  This letter denied the claims of discrimination.

"m.  The last day of classes was May 15, 2020, and grades were due from teachers on May 22, 2020.

"n.  On May 29, 2020, Respondent emailed opposing counsel because Client S.D.'s school email and school Google Drive had been deactivated. Respondent asked that his client be granted access for a limited period of time.  The school gave Client S.D. limited access on June 2, 2020, on the condition that she only forward emails she needs to her own personal account and agree not to initiate any emails to any third parties while in the email account.

"o.  On July 1, 2020, Respondent emailed opposing counsel because Client S.D. had been asked to return the school laptop and iPad. Respondent advised opposing counsel that his client was 'on the fence' about whether to continue or drop a suit against the school; but Respondent's impression was that she would be willing to drop her lawsuit if she could keep her digital devices which she needed to apply for jobs, draft resumes, cover letters, and complete on-line applications for employment.

"p.  On July 7, 2020, opposing counsel emailed Respondent and said if Client S.D. would sign a release of claims and pledge not to disparage the school on social media, the school would transfer ownership of the laptop to her.  Opposing counsel was not sure what 'digital devices' Respondent referenced in his email.  Later that same day, Respondent replied to opposing counsel and indicated that S.D. agreed.

5

"q. On July 9, 2020, opposing counsel sent an email to Respondent.  This email said that a proposed release agreement was attached for review and consideration by Respondent and his client.

"r. On July 16, 2020, opposing counsel sent an email to Respondent.  In this follow up email he asked if Respondent had any thoughts about the draft previously sent for his review.  The same document attached to the July 9th email was also attached to this email.

"s. Later that same morning Respondent replied to opposing counsel.  In this reply email, Respondent said:

'Patrick,

'Yes, I have a few thoughts.  To be straight with you, I was weighing the news this past week about the Catholic Church reportedly mis-using Emergency Disaster Loan that, if true, will get the Church in hot water. I have no certainty that  Skutt was involved in the misappropriation of funds, even though I'm sure (Client S.D.) was counted for their receipt of the PPP and EIDL loans.  After weighing this information and consulting with my client, she is inclined to move forward  and put this behind her.

'My schedule has been very busy so I anticipate returning my modifications in a day or so.

'Michael'

"t. Respondent did not send his thoughts or proposed modifications to opposing counsel; as he stated in his July 16th email.

"u. On Sunday, July 26, 2020, 4:35 pm, Respondent sent an email to the president of Skutt school, who was opposing counsel's client.  This email said:

6

'Dear Mr. Moore:

'Your attorney and I have been in consultation about a settlement between Skutt Catholic and (S.D.) pertaining to her employment discrimination lawsuit. The document releasing Skutt Catholic is attached to this email.

'While she has already signed this document, I wanted you to be aware of a conversation I had with her father, a renowned and wealthy neonatologist, who informed me that you were extremely short-sighted in not renewing her contract, especially in a pandemic and in light of his long history of philanthropic giving to Catholic organizations.

'Regardless, the settlement is signed and my client would like to move past this unfortunate incident as I am sure your (sic) are. Please sign the document and send it back to me so I can pass it on to my client.

'Sincerely,

'Michael Jahn, Esq.'

"v.   Respondent attached a document to his July 26, 2020, email to the president of Skutt school. This document was signed by Client S.D. and included significant changes from the draft document sent by opposing counsel. The unilateral changes added some language and deleted some language. One addition stated that the employer will sign the document or notify counsel of any modification, or it will be deemed to be signed by the employer within 21 days of the receipt of the document.

"w.   Respondent implied, in the cover email to opposing counsel's client, that the document he attached and sent to opposing counsel's client was the product of 'consultations' with opposing counsel. This was a material misrepresentation. The changes were unilateral and were not the product of 'consultations'. Further, Respondent told opposing counsel in his July 16, 2020, email that 'Yes, I have a few thoughts.' about changes and concluded this email by stating, 'I anticipate returning my modifications in a day or so.'

"x.   The President of the school, opposing counsel's client, did not comply with Respondent's request to sign the document that Respondent sent to him with his July 26, 2020, email.

"y.  On Monday, July 27, 2020, opposing counsel sent an email to Respondent.  Opposing counsel pointed out that Respondent knew Skutt school had legal counsel and that a draft proposed settlement agreement had been sent to Respondent, which opposing counsel was waiting for Respondent to provide proposed changes.  Additionally, this email pointed out that Respondent had no right to contact his client directly and criticize his actions and change the document behind his back.  Finally, this email concluded that Skutt rejects the settlement agreement forwarded directly to opposing counsel's client for signature.

"z.  Later that same day, Respondent replied to opposing counsel.  Respondent claimed that he was directed to communicate directly with opposing counsel's client because the draft settlement contained that direction.

"aa.  Later that afternoon, opposing counsel sent an email response to Respondent.  Opposing counsel refuted Respondent's claim that he was directed to communicate directly with opposing counsel's client.

"bb.     Respondent repeated his claim, that he was directed to communicate directly with opposing counsel's client, in his August 10 and 31, 2020 answers to the disciplinary complaint.  In his August 10, 2020, written response, Respondent described the complaint as 'relatitory (sic), vindictive, untrue, and inappropriate.'  Additionally, he stated, 'In light of the frivalness (sic) of this complaint during a public emergency, I request that this complaint be dismissed.'

"cc.  Respondent provided a different explanation for his conduct of sending an email on July 26, 2020, directly to opposing counsel's client in his Answer to the Amended Formal Complaint and attached exhibits which included his affidavit.  Respondent asserted that his client and future wife was so emotionally distraught she insisted that Respondent send the email directly to the school president.  Respondent complied because

8

he didn't think it would be a binding agreement and to reduce the emotional turmoil his client and future wife was displaying. Respondent now asserts the decision to email opposing counsel's client was impacted by his personal interest in the mental health of his client and future wife.

"dd. On August 1, 2020, Respondent sent an email to opposing counsel. Respondent attached an unedited copy of the document originally provided by opposing counsel on July 9, 2020, which was now signed by Client S.D. On August 4, 2020, staff for opposing counsel replied by attaching a fully executed copy of the original settlement agreement between the school and Client S.D.

"ee. Respondent learned that opposing counsel had filed a complaint with the Disciplinary Administrator's Office related to the July 26, 2020, email and unilaterally changed settlement that Respondent sent to Skutt school president.

"ff. On August 4, 2020, Respondent sent an email to opposing counsel and asked opposing counsel to reconsider the bar complaint filed with the Disciplinary Administrator's Office. Later that day, Respondent followed up by sending opposing counsel an email saying that his client was considering all her options.

"gg. Prior to July of 2020, Respondent and his client, S.D., were engaged to be married. Respondent had recently gone through a very difficult divorce and the custody and care of his two children was an ongoing and a contentious issue. In addition, S.D.'s mother was diagnosed with terminal cancer a few months before. S.D. has a history of depression and anxiety. When Skutt terminated her in March of 2020, a termination that S.D. attributed to her revelation that she was considering marrying Respondent without a Catholic annulment, S.D. became very upset, angry, and disrespected. S.D. saw the termination as an afront, as unjust, and she had great concerns as to how she would continue professionally in the midst of the pandemic.

9

"hh. At this time, Respondent was employed with the Small Business Administration where he was regularly working as much as 70 hours per week. He suffered from ADHD Inattentive Type, which his doctor was attempting to treat with one Ritalin tablet per day. S.D. asked Respondent to help her with her claim against Skutt Catholic. Respondent was reluctant to do so but entered into a limited representation of S.D. in which he made it clear that (a) he would take no action on S.D.'s behalf until he received admission to the Federal District Court for the District of Nebraska, and (b) that he would not represent S.D. if any court action were required and (c) she would need to find another attorney, and (d) Respondent made it clear to S.D. that he would not take any fees in return for his work for her.

"ii. Respondent quickly perceived that Skutt Catholic would not voluntarily offer any financial settlement to S.D. After discussing the matter with his client, S.D. agreed that she would release Skutt Catholic if they would permit her to keep her computer and her iPad, permit her access to her school email account and hard drive so that she could download materials that she needed, and if Skutt Catholic would agree to a non-disparagement and non-interference clause.

"jj. On July 26, 2020, Respondent understood that another workweek was about to begin and that if S.D. did not agree to accept the Settlement Agreement on that day, he did not think he would have time to work with her later in the week. As a result, a highly emotional discussion ensued in which S.D. refused to sign the Settlement Agreement that had been presented by Skutt Catholic and, in fact, she finally took the Settlement Agreement that Skutt Catholic had submitted and added modifications to it. Respondent explained to S.D. that, in his opinion, such changes constituted a counteroffer and a rejection of the offer presented by Skutt Catholic and there would be no meeting of the minds and thus, no contract.

10

"kk. S.D., however, was in a highly emotional state. She had previously discussed suicidal thoughts with Respondent he feared that she would hurt herself in the state she was in, and he did not know how to defuse the situation.

"ll. Respondent's Ritalin medication, to the extent it had any effect, had been taken many hours before. At the critical moment, he overlooked the fact that, as an attorney, he should not be communicating with a represented party. In his concern for S.D., in his sleep-deprived and inadequately medicated state, he was subject to the confusion, inattentiveness, and impulsivity of his condition and, he agreed to send the modified agreement by email to Jeremy Moore.

"mm. Since July of 2020, Respondent moved from Omaha to Johnson County, Kansas. Respondent had recently gone through a very difficult divorce and the custody and care of two of his five children was an ongoing and a contentious issue. He found a new doctor who changed Respondent's medication from Ritalin to Adderall, which Respondent takes twice per day. Respondent's control of his ADHD condition has improved markedly under his new treatment plan. Respondent has been able to start and begin to grow a practice devoted to estate planning. In this practice, Respondent has much better control over his schedule and his stress level. But most importantly, Respondent is now receiving treatment that has greatly enhanced his ability to practice law.

"nn. Respondent admits his mistake of July 26, 2020, but states that the thought of deceiving Skutt Catholic never even entered his mind. His focus was on blunting what he perceived an to be an extremely emotionally and traumatic episode in which he was truly concerned that S.D. would lose control. And his ability to attend to and recognize the consequences of actions given his lack of proper medication for his conditions undermined his ability to catch his mistake before he sent that email on July 26, 2020.

11

"2. <u>Conclusions of Law</u>: Petitioner and Respondent stipulate and agree that Respondent violated the following Supreme Court Rules and Kansas Rules of Professional Conduct: . . .

"a. KRPC 1.2(a) and (e) (Scope), provides that a lawyer shall abide by a client's decisions concerning the lawful objectives of representation, subject to paragraphs (e). Rule 1.2(e) provides that when a lawyer knows that a client expects assistance not permitted by the rules of professional conduct, the lawyer shall consult with the client regarding the relevant limitations on the lawyer's conduct. When Respondent's client insisted on communicating with a represented party by sending a modified settlement agreement which was described by Respondent as the result of consultation with opposing counsel, when it was not; and Respondent complied with his client's directive that was not permitted by the rules of professional conduct he violated Rule 1.2(e).

"b. KRPC 1.7(a)(2) (Conflict), provides that a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if there is a substantial risk that the representation of a client will be materially limited by the personal interest of the lawyer. Respondent's concern for Client S.D. and his future wife's emotional wellbeing [was] exacerbated by his ADHD medical condition which was being inadequately treated at the time. As a result, he was subject to inattentiveness, loss of focus, confusion, and impulsivity associated with his medical condition which contributed to his willingness to communicate with a represented party.

"c KRPC 8.5 (Jurisdiction), a lawyer admitted to practice in this jurisdiction is subject to the disciplinary authority of this jurisdiction although engaged in practice elsewhere.

"d. KRPC 4.1(a) (Truthfulness to Others), in the course of representing a client a lawyer shall not knowingly make a false statement of material fact or law to a third person. Respondent's May 15, 2020, demand letter

12

sent to the president of the school was on letterhead that provided a physical address for Respondent. Respondent's office letterhead address on his demand letter does not coincide with any address on his Kansas Attorney registration forms listing his home or business address. The address provided by Respondent on his demand letter is a single-family home. Respondent was living at Client S.D.'s home and this was not their home address. The address on Respondent's demand letter was a false statement of material fact to a third person. Additionally, Respondent's May 15, 2020, demand letter to Skutt school stated that 'attorney fees to date are $25,666,' which was false because Respondent agreed to work on S.D.'s case pro bono. Further, Respondent's July 26, 2020, email to the president of Skutt school implied that the document attached to Respondent's email was the result of consultations with opposing counsel, when that is factually incorrect.

"e. KRPC 4.2 (Communication Represented Persons), prohibits a lawyer from communicating about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer. Respondent sent an email to the president of Skutt school when Respondent knew the president was represented. Additionally, Respondent had been directed on May 22, 2020, to direct any future correspondence to the attorney. Further, the unilaterally modified settlement was signed by Client S.D. and Respondent's email directed the president of Skutt to sign the document, which contained a provision that it would be deemed accepted if not signed within 21 days. If the president of Skutt had trusted Respondent that the document was the product of 'consultation' with opposing counsel and signed as directed by Respondent, it would have been a binding contract which would require litigation to show that it was not enforceable due to mistake or fraud.

"f. KRPC 8.4(a) (c) and (d) (Misconduct), Subparagraph (a) prohibits a lawyer from violating or attempting to violate the rules of professional conduct. Subparagraph (c) prohibits engaging in conduct involving

13

misrepresentation. Respondent's Retainer Agreement for Attorney Services, dated March 28, 2020, stated that Respondent held a license to practice law in Federal District of Nebraska, which was a false statement of material fact. The retainer agreement was provided to Office of Disciplinary Administrator. The Office of Disciplinary Administrator did not investigate Respondent's Retainer Agreement for Attorney Services as unlicensed practice of law based on the representation in his document that he held a federal license in Nebraska at the time. Subparagraph (d) prohibits a lawyer from engaging in conduct that is prejudicial to the administration of justice. Respondent asked the complainant to reconsider his bar complaint which is prejudicial to the administration of justice. The Disciplinary Administrator's Office has a duty to investigate complaints of unprofessional conduct. Respondent learned of the complaint and asked opposing counsel to reconsider the bar complaint. The same day, Respondent sent a follow up email stating that his client was considering all of her options.

. . . .

"4. <u>Recommendations for Discipline:</u> Petitioner and Respondent jointly recommend that Respondent be suspended for six-months but that three months be stayed. Additionally, that Respondent be placed on one year of probation that includes:

"a. The Respondent will sign and follow all aspects of a KALAP [Kansas Lawyers Assistance Program] Monitoring Agreement.

"b. The Respondent will participate in a KALAP Law Practice Management program, which will include a consultation and implementation of recommendations.

"c. The Respondent will participate in a KALAP peer mentoring and support.

14

"d.  Respondent will consult with KALAP to identify a practice monitor to work with him on a regular basis during the term of his probation.

"e.  Respondent will pay the costs in an amount to be certified by the Disciplinary Administrator's Office.

"5. Additional Statements and Stipulations:

"a.  Petitioner and Respondent agree that no exceptions to the findings of fact and conclusions of law will be taken.

"b.  Respondent understands and agrees that pursuant to Supreme Court Rule 223(f), this Summary Submission Agreement is advisory only and does not prevent the Supreme Court from making its own conclusions regarding rule violations or imposing discipline greater or lesser than the parties' recommendation.

"c.  Respondent also understands and agrees that after entering into this Summary Submission Agreement he will be required to appear before the Kansas Supreme Court for oral argument under Supreme Court Rule 228(i)."

## DISCUSSION

In a disciplinary proceeding, this court generally considers the evidence, the disciplinary panel's findings, and the parties' arguments to determine whether KRPC violations exist and, if they do, the appropriate discipline to impose. Attorney misconduct must be established by clear and convincing evidence. *In re Foster*, 292 Kan. 940, 945, 258 P.3d 375 (2011); see also Supreme Court Rule 226(a)(1)(A) (2022 Kan. S. Ct. R. at 281) (a misconduct finding must be established by clear and convincing evidence). "Clear

15

and convincing evidence is 'evidence that causes the factfinder to believe that "the truth of the facts asserted is highly probable."'" *In re Lober*, 288 Kan. 498, 505, 204 P.3d 610 (2009).

The Disciplinary Administrator provided Jahn with adequate notice of the formal complaint and the hearing on the formal complaint, but Jahn waived that hearing as part of the summary submission agreement. In compliance with the version of Rule 223(b) in effect at the time, the summary submission agreement contained the following information:

> "(1) an admission that the respondent engaged in the misconduct;
> (2) a stipulation as to the contents of the record, findings of fact, and conclusions of law—including each violation of the Kansas Rules of Professional Conduct, the Rules Relating to Discipline of Attorneys, or the attorney's oath of office;
> (3) a recommendation for discipline;
> (4) a waiver of the hearing on the formal complaint; and
> (5) a statement by the parties that no exceptions to the findings of fact or conclusions of law will be taken." Rule 223(b) (2021 Kan. S. Ct. R. at 273).

The Kansas Board for Discipline of Attorneys approved the summary submission and canceled a hearing under Rule 223(e)(2). As a result, the factual findings in the summary submission are admitted. See Supreme Court Rule 228(g)(1) (2022 Kan. S. Ct. R. at 288) ("If the respondent files a statement . . . that the respondent will not file an exception . . . , the findings of fact and conclusions of law in the final hearing report will be deemed admitted by the respondent.").

When the parties signed the summary submission agreement, Rule 223 did not require the agreement to identify applicable aggravating or mitigating factors. See Rule 223 (2021 Kan. S. Ct. R. at 273). However, the current version of Rule 223 does impose this requirement. See Rule 223(b)(2)(D) (2022 Kan. S. Ct. R. at 277). At oral argument,

16

the attorney representing the office of the Disciplinary Administrator recited the following aggravating and mitigating factors:

Aggravating Factors:  prior discipline and multiple offenses. See ABA Standards for Imposing Lawyer Sanctions, § 9.2.

Mitigating Factors:  personal and emotional issues, cooperation in the disciplinary investigation and proceedings, and remorse. See ABA Standards for Imposing Lawyer Sanctions, § 9.3.

Jahn orally stipulated to the existence of both the aggravating and mitigating factors set forth by the attorney for the Disciplinary Administrator's office. We thus adopt the findings and conclusions set forth by the parties in the summary submission and at oral argument.

Before proceeding, we take this opportunity to address some of the evidence presented to establish that Jahn violated KRPC 4.1(a) (truthfulness). Jahn sent a demand letter to the opposing party, Skutt Catholic High School, stating that "attorney fees to date are $25,666," and his client, S.D., was willing to settle for an amount of money that included those attorney fees. The summary submission agreement claims Jahn's statement that "attorney fees to date are $ 25,666" misrepresented the facts because he had agreed to represent S.D. pro bono. We are not persuaded this statement constitutes clear and convincing evidence of untruthfulness.

Although Jahn was not charging S.D. for his services, S.D. may still have been entitled to an award of attorney fees if she had prevailed on her employment discrimination claims against Skutt. Both federal law and Nebraska state law authorize courts to award attorney fees in employment discrimination cases. See 42 U.S. C.

§ 2000e-5(k) (2018) (granting courts discretion to award attorney fees to prevailing party in federal employment discrimination action); Neb. Rev. Stat. § 48-1120 (granting courts discretion to award attorney fees when state employment discrimination action is appealed to district court).

And both federal courts and Nebraska state courts have held that a prevailing party may recover attorney fees even when his or her attorney provided representation pro bono. See *Blanchard v. Bergeron*, 489 U.S. 87, 95, 109 S. Ct. 939, 103 L. Ed. 2d 67 (1989) (fact that nonprofit legal services organization represented prevailing civil rights plaintiff pro bono did not preclude award of attorney fees); *Starks v. George Court Co., Inc.*, 937 F.3d 311, 315-16 (7th Cir. 1991) (holding court did not abuse its discretion in awarding attorney fees to prevailing employment discrimination plaintiff who proceeded in forma pauperis and received court-appointed counsel); *Copeland v. Marshall*, 641 F.2d 880, 899-900 (D. C. Cir. 1980) (holding law firm's decision to originally provide pro bono representation irrelevant in determining attorney fee award in federal employment discrimination case); *Black v. Brooks*, 285 Neb. 440, 450-56, 827 N.W.2d 256 (2013) (statute permitted reasonable attorney fees to be awarded to pro bono attorneys representing tenant in claim against landlord); see also *Seller v. Reefer Systems*, 305 Neb. 868, 943 N.W.2d 275 (2020) (award of "reasonable attorney fees" in workers compensation case based on value of services provided and not fee agreement).

Because the law does not foreclose S.D. from pursuing an award of attorney fees merely because Jahn was providing legal services to S.D. pro bono, Jahn's request for attorney fees does not clearly and convincingly establish a violation of KRPC 4.1(a). Even so, other evidence supports a finding that Jahn violated KRPC 4.1(a), including: (1) his use of a letterhead with an incorrect physical address for his office; and (2) his email to the opposing party, with a modified settlement agreement attached, which implied the attached settlement was the product of "consultations" with the opposing

18

party's counsel. And we find this evidence sufficient to meet the clear and convincing standard, even without considering Jahn's statement about attorney fees in the demand letter.

We conclude that the summary submission and the parties' stipulations before us establish by clear and convincing evidence that the charged conduct violated KRPC 1.2(a) and (e) (2022 Kan. S. Ct. R. at 329) (scope of representation); KRPC 1.7(a)(2) (2022 Kan. S. Ct. R. at 342) (conflict of interest); KRPC 4.1(a) (2022 Kan. S. Ct. R. at 403) (truthfulness); KRPC 4.2 (2022 Kan. S. Ct. R. at 404) (communication with person represented by counsel); KRPC 8.4(a), (c), and (d) (2022 Kan. S. Ct. R. at 434) (misconduct); and KRPC 8.5 (2022 Kan. S. Ct. R. at 435) (jurisdiction).

The only remaining issue is to decide the appropriate discipline for these violations. In the summary submission agreement, the parties jointly recommend a six-month suspension of Jahn's law license with the suspension being stayed after three months provided that Jahn enter a one-year probation plan approved by the Disciplinary Administer. A summary submission agreement is advisory only and does not prevent us from imposing discipline greater or lesser than the parties' recommendation. Rule 223(f). After full consideration, we hold that the appropriate sanction for Jahn's misconduct is a six-month suspension with the suspension being stayed after three months provided Jahn enters an approved one-year probation plan that includes the following conditions:

1. Sign and follow KALAP Monitoring Agreement;
2. Participate in KALAP Law Practice Management program, including consultation and implementation of recommendations;
3. Participate in KALAP peer mentoring and support; and
4. Consult with KALAP to identify a practice monitor to work with regularly during probation.

19

A minority of the court would impose more severe discipline.

CONCLUSION AND DISCIPLINE

IT IS THEREFORE ORDERED that Michael P. Jahn is suspended for six months from the practice of law in the state of Kansas, effective the date of this opinion, in accordance with Supreme Court Rule 225(a)(3) (2022 Kan. S. Ct. R. at 281) for violations of KRPC 1.2(a) and (e) (2022 Kan. S. Ct. R. at 329) (scope of representation); KRPC 1.7(a)(2) (2022 Kan. S. Ct. R. at 342) (conflict of interest); KRPC 4.1(a) (2022 Kan. S. Ct. R. at 403) (truthfulness); KRPC 4.2 (2022 Kan. S. Ct. R. at 404) (communication with person represented by counsel); KRPC 8.4(a), (c), and (d) (2022 Kan. S. Ct. R. at 434) (misconduct); and KRPC 8.5 (2022 Kan. S. Ct. R. at 435) (jurisdiction).

IT IS FURTHER ORDERED that respondent shall comply with Supreme Court Rule 231 (2022 Kan. S. Ct. R. at 292).

IT IS FURTHER ORDERED that the above suspension will be stayed after the first three months provided respondent enters a probation plan approved by the Disciplinary Administrator's office that extends for one year. No stay of the suspension shall be effective until the Disciplinary Office approves a probation plan.

IT IS FURTHER ORDERED that the costs of these proceedings be assessed to respondent and that this opinion be published in the official Kansas Reports.